Filed 5/21/25  In re T.W. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re T.W. et al., Persons Coming Under the Juvenile Court Law. | B339428 (Los Angeles County Super. Ct. No. 24CCJP00953A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>M.M.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, M.M. (mother) challenges the juvenile court's jurisdictional findings as to her three-year-old twin daughters T.W. and E.W. (collectively, the twins). Mother argues substantial evidence supports neither the court's findings that her mental health issues limited her ability to care for and supervise the twins nor the court's findings that the twins were at risk due to past sexual abuse by their father. We find no error as to the findings regarding mother's mental health and her ability to care for the twins. Thus, we affirm.

## BACKGROUND

### 1. The Family

Mother and the twins are from Honduras. In July 2023, mother fled her home and emigrated with the twins to the United States, seeking asylum and to escape the twins' father Edwin W. (father). Despite efforts to locate father, his whereabouts remained unknown for the duration of the proceedings below. According to mother, father continued to reside in Honduras. Neither she nor the twins had any contact with him. Mother has three older children (two teenagers and a seven-year-old) from a different relationship, all of whom reside in Honduras with members of mother's family.

Mother speaks a Honduran dialect called Miskito. Mother described men in her Miskito culture as "dominant, abusive and violent with our women." She said "nothing is done to prosecute abusers." Mother struggled to escape her relationship with father. They lived in a small village in a remote mountainous region of Honduras. Mother said, for years, father beat her with his fists or a belt, and slapped her when he came home drunk or drugged. He raped her. One time, father hit her ear so hard that it bled and caused hearing loss. One night, when the twins were a year old, father was drunk and threatened to harm mother if she did not buy drugs for him. Mother left to buy drugs and, upon her return, she saw father fondling the twins' vaginas with his hands while they slept. Mother hit father with a liquor bottle, he passed out, and mother fled with the twins. She left her older children with her sister.[1]

Eventually, mother came to Los Angeles and found work as a housekeeper and street vendor. When the underlying proceedings began, the twins were three years old. Mother lived alone with the twins. Mother stated the twins had no behavior problems, she had no criminal history, and she denied using drugs or alcohol. She had no relatives or other support to help care for the twins. Although mother's friend and employer, Marvin B., was a support for mother, he was not able to "chase the children around, if needed," because he was missing one foot and was not available to help with the twins long term.

---

[1] Mother's three older children were fathered by an adult male to whom mother had been sold (by her mother) when she was 12 years old.

Although mother's first language is Miskito, she stated she understood Spanish. A Spanish translator assisted mother during the juvenile court proceedings.

## 2. Events Preceding Petition

In March 2024, mother was hospitalized on a Welfare and Institutions Code section 5150 psychiatric hold (5150 hold). She was suffering from suicidal ideation, confusion, and depression. Because mother had been hospitalized, she could not and did not pick up the twins from their daycare. Daycare staff tried to reach both mother and her emergency contact, Marvin B. Mother did not answer her phone and Marvin B.'s number had been disconnected. A referral was made to the Los Angeles County Department of Children and Family Services (Department) and, based on exigent circumstances, the twins were taken into protective custody and placed together with a foster family.

A Department social worker contacted mother in the hospital. Mother told the social worker she had "a craziness in her head," had "many things going on in her head," and was "very sad." Mother stated she had "thoughts of hurting herself," a couple of weeks earlier she had "cut her hands with a razor," and when she "hurts her arms she feels as if she is relieving her systems." She also said she would never hurt herself again. Mother informed the social worker she did not have anyone to care for her children. She noted Marvin B. could not help because he was sick. Mother said she had been told someone would pick up the twins from daycare and care for them while she was in the hospital.

Mother had no prior hospitalizations and was "linked to therapy with St. Johns Medical clinic." A supervisor at St. Johns Clinic reported mother had been referred to the clinic for

4

depression and she was receiving therapy. The supervisor also stated mother was "experiencing many symptoms of suicidal ideation," prompting her 5150 hold.

Mother had been transferred to the hospital after she reported hurting herself, having racing thoughts, and experiencing many stressors including a job loss, financial hardship, and no family support. She reported years of abuse by father. She continued to experience "anxiety, nightmares and flashbacks." Mother denied suicidal ideation but said sometimes she hit herself and, two weeks earlier, she cut herself "to try to cope with her emotional pain." Later, however, she admitted to feeling depressed and having thoughts of "SI" for the past weeks. It was noted mother "may be likely minimizing Suicidal Ideation." Mother was described as "cooperative but anxious" and she was worried about her twins. Mother was diagnosed with "Unspecified Mood Disorder-Post Traumatic Stress Disorder." A staff member translated to Spanish for mother while she was in the hospital.

At the hospital, mother was advised that "feeling depressed and disclosing that she feels suicidal will not be the reason to take away her children" unless the Department "investigates and determines neglect or child abuse or that she is unable to provide care to the children."

After a few days, mother was released from the hospital. Her doctor did not prescribe medication but told her she "was very sad" and to speak with a therapist.

Soon after being released from the hospital, mother spoke with a Department social worker. She recanted statements she had made while in the hospital. She denied the stated reasons for her hospitalization—i.e., "danger to self, feeling depressed,

5

thoughts of suicide and a history of wanting to cut her wrist with a knife." Mother said a scar on her wrist was caused by a bracelet, not by her cutting herself. She insisted her hospitalization and the resulting removal of her children were directly related to her hearing impairment and inability to speak and understand Spanish well.

The social worker also spoke with Marvin B. He was willing to help mother with the twins "for a few days" if she was hospitalized again. Because of his physical limitation, however, he said he could not chase the twins around if needed. Marvin B. had no concerns about mother's mental health. Similarly, staff at the twins' preschool had no concerns of abuse or neglect regarding the twins.

The Department assessed the twins at a "Low" risk of future abuse and neglect in mother's care. Nonetheless, the Department concluded court intervention was necessary based on what the Department believed was mother's unresolved mental health issues. In coming to its conclusion, the Department noted mother's years of abuse by father, her tendency to self-harm as a way to cope with her mental health issues, her recent involuntary hospitalization, her lack of a support system, and the young and vulnerable age of the twins. The Department also was "highly concerned" that mother had recanted her statements made while hospitalized.

3. **Petition**

In March 2024, a few days after mother's hospitalization, the Department filed a Welfare and Institutions Code section 300 petition on behalf of the twins (petition).[2] The petition alleged

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

one count under subdivision (b) of section 300. Specifically, the petition alleged the twins were at risk of harm due to mother's mental and emotional problems, including depression, suicidal ideation, and self-harming behavior, which rendered mother unable to provide regular care and supervision of the twins.

At the initial hearing on the petition, counsel for mother asked that the twins be returned to mother's care as she had been released from the hospital and was willing to participate in any court ordered services. Counsel for the twins, however, argued detention was appropriate. The juvenile court detained the twins from mother and ordered monitored visitation. The court also ordered, among other things, an emergency clothing allowance and a referral for dental work for the twins.

At the hearing, a Spanish interpreter assisted mother. The juvenile court noted mother had been able to "speak with her lawyer in Spanish as well as the Department and the hospital where she was treated." The interpreter's office required a few weeks to locate a Miskito interpreter for mother. The court wanted to have the trial of the matter in Miskito.

4.     **Continued Investigation**

By the end of March 2024, mother was participating in individual therapy. Mother visited regularly with the twins, who ran to her during visits. The Department noted no concerns during visits. At an April 2024 progress hearing, the juvenile court gave the Department discretion to release the twins to mother.

In May 2024, the Department reported that, months earlier, in December 2023, mother had undergone a mental health assessment in connection with her housing services. A social worker with mother's housing program stated although

mother was "tearful" while discussing the "deeply personal trauma she experienced in both her child and adult life," she did not report current or past suicidal ideations. Housing staff had no concerns with mother, but instead reported mother was compliant with program guidelines and "very attentive to her children." Mother's relationship with her children was routinely described in positive terms.

In May 2024, a Department social worker also spoke with mother again. She said the "situation is all a misunderstanding." The day she was hospitalized, mother had told someone named Maria O. about the suffering she had experienced in her life. Maria O. took mother to speak with a therapist, who then told mother she would be taken by ambulance to a hospital for treatment. When mother said she had to pick up the twins from daycare, she was told someone would pick them up. Mother asked someone to call Marvin B. Mother told the social worker she did not know she was being taken to a mental hospital. At the hospital, mother was told she was there "for this and that." Mother said, for the first two days, the attending doctors did not speak Spanish. On the third day, a Spanish speaking doctor asked mother why she was there, to which mother explained the suffering she had experienced in Honduras. The doctor told mother she "should have been sent to the therapist instead." Mother was discharged that day. Mother noted she could not read or write and did not speak Spanish fluently. She believed the "professionals may have not understood me and I did not understand them."

Mother understood she was hospitalized because " 'they say I wanted to die.' " Mother denied wanting to die. She wanted to live and asked " 'God for a long life to see my children grow and

8

meet my future grandchildren. I have the will to live.' " She noted if she wanted to die, she would have killed herself when father was beating or raping her. She said father hit her on her head and ears, which caused her hearing impairment. Mother again denied suicidal thoughts and again insisted the scar on her wrist was caused by a bracelet. She said she had benefited from seeing a therapist once a week for eight months.

Also in May 2024, mother completed an "Integrated Behavioral Health Initial Assessment" at St. Johns Health Center, resulting in an assessment of "Major Depressive Disorder, Post Traumatic Stress Disorder and Generalized Anxiety Disorder." She denied suicidal ideation. Mother was prescribed anxiety medication to be taken "as needed." She would continue talk therapy and supportive psychotherapy.

E.W. had two cavities, but otherwise her medical exam was normal. T.W.'s medical exam indicated she had "poor dentition," as well as both speech and developmental delays. T.W.'s two upper front teeth were infected and so deteriorated that they needed to be removed. Six additional teeth had significant damage. The twins received dental treatment in June 2024.

In its May 2024 jurisdictional report, the Department expressed "high concern" that mother had made conflicting statements regarding suicidal ideation and self-harm. The Department noted mother "minimizes her mental health stating she is misunderstood and does not understand how her current mental health has an impact on the quality of care she provides her children." Noting the twins' tender age, the Department also was concerned with mother's limited social network, which the Department believed might impede mother's ability to make a

safety plan for the twins should she have future mental health emergencies.

Prior to the adjudication, mother indicated she did not want "a dialect translator in Court." She wanted to proceed with the court's Spanish translator, stating she understood Spanish "perfectly." Mother noted she had "a hearing issue that has affected her." She did not want the court proceedings to be rescheduled.

**5.    Amended Petition**

In May 2024, a referral was made alleging father had emotionally and sexually abused the twins. Two days later, the Department filed an amended petition. The amended petition added two counts. One alleged the twins were at risk because mother and father had a history of verbal and physical altercations. The other alleged father had sexually abused the twins. The juvenile court accepted the amended petition and dismissed the underlying petition.

**6.    Adjudication and Disposition**

The combined jurisdiction and disposition hearing was held on July 9, 2024. Counsel for mother asked the juvenile court to dismiss the amended petition in its entirety. Counsel argued there had been a misunderstanding, noting mother is from a small village in Honduras, she has trouble communicating because of language barriers, and "when she was sharing some information about her mental state, it may have been blown way out of proportion." Counsel reminded the court mother had stated she did not want to die but wanted to live, to see her children grow, and to meet her future grandchildren. Counsel noted mother was employed with a stable income and had community support from her employer and her case manager.

10

Counsel argued the twins were never in danger and, at the least, urged the court to place the twins with mother and order family maintenance services.

Counsel for the twins asked the court to sustain the allegations based on mother's mental health issues and past domestic abuse, but to dismiss the allegations of sexual abuse by father. In contrast with mother's attorney, counsel for the twins did not believe language barriers had hampered mother's ability to describe her mental state. Counsel noted mother was able to describe the trauma she had experienced before arriving in the United States. Counsel stated mother had "enough of a grasp on the language to communicate complex thoughts" and she knew what she was communicating when she spoke of her mental health crisis that resulted in her hospitalization. Counsel for the twins argued court supervision and the twins' placement were necessary especially because mother had recanted her earlier statements and downplayed the seriousness of her mental health issues.

Counsel for the Department argued the juvenile court should sustain the amended petition in its entirety. The Department was concerned that mother was not forthcoming about her suicidal ideation or self-harming behavior. Counsel for the Department also believed mother was able to communicate sufficiently. Counsel noted mother had been "very clear" about father's abuse, rape, and other events.

After hearing argument, the juvenile court sustained the subdivision (b) count concerning mother's mental and emotional problems as well as the count alleging father sexually abused the twins. The court dismissed the remaining count concerning mother and father's history of domestic violence. The juvenile

court stated it did not believe mother's explanation for the scar on her wrist (i.e., that a bracelet had cut her wrist). Rather, the court believed mother was making an excuse for something she did (cut herself) but later realized she did not like. The court noted self-harming behavior, such as that mother had described, could inadvertently lead to suicide. The court also believed mother had been able to communicate despite her language barriers. The court stated it was "very concerned" for mother and wanted "to ensure that mother has the support that she needs in order to deal with her mental health issues."

The court declared the twins dependents of the court under subdivisions (b) and (d) of section 300 and ordered them removed from mother's custody and care. The court ordered mother to attend a Spanish-speakers domestic violence support group for victims, to participate in individual counseling, to submit to a psychological assessment, and to take all prescribed medications. Mother was granted monitored visitation, and the Department was authorized to liberalize her visits to unmonitored and overnight.

7. **Appeal and Postappeal Events**

Mother appealed the court's July 9, 2024 orders.

On January 7, 2025, while mother's appeal was pending, the juvenile court ordered the twins returned to mother's custody and care under Department Supervision. We granted mother's request for judicial notice of the court's January 7, 2025 orders.

## DISCUSSION

1. **Applicable Law**

Under subdivision (b) of section 300, the juvenile court may assert dependency jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer,

12

serious physical harm or illness, as a result of any of the following:  [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness." (§ 300, subd. (b).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.)  'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, at p. 773.)  " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

## 2.    **Standard of Review**

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note

13

that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*) In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order. (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

### 3. Substantial evidence supports the juvenile court's jurisdictional findings under subdivision (b).

Mother argues substantial evidence does not support the juvenile court's finding that her mental health issues put the twins at risk of serious harm. We disagree.

It is undisputed mother cared for and loved her twins. Indeed, mother found the strength to leave the twins' abusive father, travel to the United States to seek asylum with her two young children, find work, housing and health services, all without speaking English. Mother appears quite courageous and capable. Nonetheless, we must address whether substantial evidence supports the juvenile court's finding that mother's mental health issues put the twins at risk of serious harm. On the record before us, we conclude substantial evidence supports this finding.

14

Although mother gave conflicting statements, substantial evidence supports a determination that mother had serious mental health issues, including depression, suicidal ideation, and self-harming behavior. The juvenile court rejected the argument that mother was placed on a 5150 hold due to a misunderstanding. The court found mother was sufficiently able to communicate despite her language barriers. Similarly, the court rejected mother's explanation for the visible scar on her wrist. The court believed mother cut herself to cope with real stressors in her life. As noted above, we cannot reweigh the evidence, exercise independent judgment as to the facts, or substitute our credibility determination for those of the trial court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Issues of fact and credibility fall squarely within the juvenile court's province. (*Ibid.*)

A finding that mother had significant mental health issues, however, is not the end of our inquiry. As both mother and the Department correctly note, mental health issues alone cannot support dependency jurisdiction. (*In re L.W.* (2025) 109 Cal.App.5th 1012, 1019.) Here, the juvenile court's jurisdictional findings were not based solely on mother's mental health issues. First, mother repeatedly minimized or denied her mental health issues. By not acknowledging or recognizing the severity of her mental health issues, it was reasonable to conclude mother would not adequately address those issues, which included self-harming behavior and suicidal ideation. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Second, mother had no—or, at best, an insufficient—support system for the twins. This lack of a support system was

a serious concern. At the time of the court's jurisdictional findings, the twins were three years old. Contrary to mother's position on appeal, the risk posed to the twins was not purely conjecture. Without acknowledging and, therefore, fully addressing her mental health issues, mother created an unfortunate and untenable risk for her twins. If mother were to self-harm again or, worse, act on her suicidal ideation, the twins would be alone and without anyone to care for them. Although mother's friend and employer Marvin B. was a support for mother, he could help for only a few days at a time and was not able to "chase" after the twins due to his physical limitation. We conclude substantial evidence supports the juvenile court's jurisdictional findings based on mother's unresolved mental health issues.

This case is factually distinct from *In re L.W.*, *supra*, 109 Cal.App.5th 1012, a recent First District case on which mother relies. In that case, the First District reversed jurisdictional findings based on the mother's mental illness, history of substance abuse, and leaving her minor daughter without adequate care. (*Id.* at pp. 1015–1016.) The minor at issue was eight years old. Her mother had suffered a mental health crisis resulting in an eight-day hospitalization. (*Id.* at p. 1015.) During the mother's hospitalization, multiple family members, including the minor's stepfather and her maternal grandmother, were ready and willing to care for the minor. The stepfather was married to the minor's mother and had cared for and lived with the minor since she was 11 months old. (*Id.* at p. 1017.) The maternal grandmother previously had adopted three of the minor's older siblings. (*Id.* at p. 1014.) There is no indication the minor's mother had minimized or denied her mental health

16

issues.  In light of these factual differences, we do not find *In re L.W.*, *supra*, 109 Cal.App.5th 1012, persuasive here.

Because we affirm the juvenile court's jurisdictional findings as to mother under subdivision (b) of section 300, we need not and do not address the remaining jurisdictional finding under subdivision (d) of section 300.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

**DISPOSITION**

The juvenile court's July 9, 2024 orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:


ASHMANN-GERST, J.



RICHARDSON, J.

17